U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

**2019 AUG 16 PM 1: 30**

CLERK

BY _____

DEPUTY CLERK

MELANIE M.,                          )
                                     )
        Plaintiff,                   )
                                     )
        v.                           )          Case No. 5:18-cv-149
                                     )
NANCY A. BERRYHILL, Acting           )
Commissioner of Social Security,     )
                                     )
        Defendant.                   )

## OPINION AND ORDER
## (Docs. 14, 16)

Plaintiff Melanie M. brings this action under 42 U.S.C. § 405(g) of the Social Security

Act, requesting reversal of the decision of the Commissioner of Social Security, after a 2017

remand, denying her two consolidated applications for disability insurance benefits (DIB).

Pending before the court is Plaintiff's motion to reverse the decision of the Commissioner

(Doc. 14) and the Commissioner's motion to affirm (Doc. 16). Plaintiff's motion is GRANTED,

the Commissioner's motion is DENIED, and the matter is REMANDED for further proceedings

and a new decision.

## Background

Plaintiff was 33 years old on her alleged onset date of January 16, 2013. She testified at

her November 19, 2014 hearing that she has experienced problems since a 2008 motor vehicle

accident in which she was ejected from the vehicle and landed on her right side. (AR 770, 777.)

At her April 25, 2018 hearing, Plaintiff stated that after the motor vehicle accident, her ribs

healed wrong and that "messed up my whole shoulder mechanism." (AR 816.) She also states

that she sustained a traumatic brain injury (TBI) in the 2008 accident. (AR 831.) She testified to

numerous other medical and mental health difficulties, including "overbearing" and "permanent"

pain (AR 766, 815), fatigue (AR 768, 782), migraines (AR 774, 813), hip pain (AR 777), depression, anxiety, and posttraumatic stress disorder (PTSD) (AR 779, 819, 832), short-term memory loss (AR 782), a left leg nerve problem with numbness (AR 807, 833), a hysterectomy and subsequent urinary problem that required surgery (AR 809–10), and total hearing loss in her left ear (AR 814).

Plaintiff completed high school in three years and completed a four-year degree in psychology, with some coursework towards a master's degree in occupational therapy. (AR 764.) After college she worked in accounts payable for a building materials supplier and as a personal banker for a bank. (*Id.*) She worked part-time for Turning Point (an addiction recovery center) in 2013 and 2014 (AR 765, 826) and at Home Depot in 2015 and 2016. (AR 805.)

Plaintiff testified at her 2014 hearing that in a typical day she would wake up after sleeping poorly, get dressed, and go to work at Turning Point at around 9:00 or 10:00 a.m. (AR 767–68.) She would return home after working for four hours and rest until her husband returned home. (AR 768.) If she felt well enough she might make a five-minute car ride to visit her grandmother. (AR 769.) At her 2018 hearing, Plaintiff testified that she left the part-time job at Turning Point because she physically could not do the job anymore. (AR 826.) She left the job with Home Depot on her doctor's orders. (AR 807.) She testified that she spends most of each day resting. (AR 823.) In good weather she tries to walk short distances or "swim for therapy in my pool." (AR 828.)

Plaintiff filed an application for DIB on February 20, 2013. (AR 94.) That claim was denied initially on May 21, 2013 (*id.*) and on reconsideration on September 13, 2013. (AR 108.) She requested a hearing, and Administrative Law Judge (ALJ) Thomas Merrill conducted a

2

hearing on November 19, 2014. (AR 762–800.) ALJ Merrill issued an unfavorable decision on February 27, 2015. (AR 859.) The Appeals Council denied her request for review on May 11, 2016. (AR 1.)

Plaintiff filed a subsequent claim for DIB on May 30, 2016. (*See* AR 891.) She also filed a complaint with this court on July 5, 2016, appealing the denial of the claim that she filed in February 2013. [*Melanie M.*] *v. Berryhill*, No. 2:16-cv-190 (D. Vt. July 5, 2016). Acting on the Commissioner's assented-to motion to remand, the court reversed and remanded for further proceedings. (AR 885.) The Appeals Council accordingly remanded with instructions to (1) address a conflict between Plaintiff's reaching limitations and her past relevant work; (2) give further consideration to whether Plaintiff can perform her past relevant work; and (3) obtain supplemental evidence from a vocational expert to clarify the effect of the assessed limitations on Plaintiff's ability to perform past relevant work and, if appropriate, her occupational base. (AR 891.) The Appeals Council noted Plaintiff's separate May 30, 2016 claim and directed the ALJ to "consolidate the claim files, associate the evidence, and issue a new decision on the consolidated claims." (*Id.*)

On remand, ALJ Merrill convened a hearing on April 25, 2018. (AR 803–54.) Plaintiff appeared at the hearing and was represented by Margaret Sayles. Vocational Expert (VE) Louis LaPlante also testified. ALJ Merrill issued an unfavorable decision on June 22, 2018. (AR 720–45.) Plaintiff appealed to this court on September 14, 2018. (Doc. 3.)

## **ALJ Decision**

Social Security Administration regulations set forth a five-step, sequential evaluation process to determine whether a claimant is disabled. *McIntyre v. Colvin*, 758 F.3d 146, 150 (2d Cir. 2014). First, the Commissioner considers "whether the claimant is currently engaged in

3

substantial gainful activity." *Id.* Second, if the claimant is not currently engaged in substantial gainful activity, then the Commissioner considers "whether the claimant has a severe impairment or combination of impairments." *Id.* Third, if the claimant does suffer from such an impairment, the inquiry is "whether the impairment meets or equals the severity of the specified impairments in the Listing of Impairments." *Id.* Fourth, if the claimant does not have a listed impairment, the Commissioner determines, "based on a 'residual functional capacity' assessment, whether the claimant can perform any of his or her past relevant work despite the impairment." *Id.*

Finally, if the claimant is unable to perform past work, the Commissioner determines "whether there are significant numbers of jobs in the national economy that the claimant can perform given the claimant's residual functional capacity, age, education, and work experience." *Id.*; *see* 20 C.F.R. §§ 404.1520, 416.920. The claimant bears the burden of proving her case at steps one through four. *McIntyre*, 758 F.3d at 150. At step five, there is a "limited burden shift to the Commissioner" to "show that there is work in the national economy that the claimant can do." *Poupore v. Astrue*, 566 F.3d 303, 306 (2d Cir. 2009) (per curiam).

Employing the five-step sequential analysis in his June 22, 2018 decision, ALJ Merrill first determined that Plaintiff has not engaged in substantial gainful activity since January 16, 2013, the alleged onset date. (AR 723.) At step two, the ALJ found that Plaintiff has only one severe impairment: myofascial pain syndrome. (*Id.*) The ALJ noted other diagnoses in the record—including hearing loss, a vesicovaginal fistula, headaches, an affective disorder, and "various psychiatric diagnoses"—but concluded that none constituted a "severe" impairment. (AR 723–28.) At step three, the ALJ concluded that Plaintiff does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments. (AR 731.)

4

Next, the ALJ determined that Plaintiff has the residual functional capacity (RFC) to perform "light work" as defined in 20 C.F.R. § 404.1567(b),[1] except as follows:

[S]he could lift and carry 20 pounds occasionally and 10 pounds frequently; stand or walk for six hours and sit for six hours total in an eight-hour day; occasionally push and/or pull with the right upper extremity; occasionally reach with the right upper extremity; never climb ladders, ropes, or scaffold but occasionally climb ramps or stairs, balance, stoop, kneel, crouch, and crawl; and avoid even moderate exposure to vibrations and hazards.

(AR 732.) Given that RFC, the ALJ found at step four that Plaintiff is unable to perform any past relevant work. (AR 743.) At step five, the ALJ considered Plaintiff's age, education, work experience, and RFC, and concluded that there are jobs that exist in significant numbers in the national economy that Plaintiff could perform, including companion, usher, furniture rental clerk, and surveillance system monitor. (AR 744.) The ALJ accordingly concluded that Plaintiff has not been under a disability, as defined in the Social Security Act, from January 16, 2013 through the date of the decision. (AR 745.)

## **Standard of Review**

The Social Security Act defines disability, in pertinent part, as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to

---

[1] Section 404.1567(b) defines light work as follows:

Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.

last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Under the Act, a claimant will only be found disabled if his "impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." *Id.* § 423(d)(2)(A).

In considering the Commissioner's disability decision, the court conducts "a plenary review of the administrative record to determine if there is substantial evidence, considering the record as a whole, to support the Commissioner's decision and if the correct legal standards have been applied." *Brault v. Soc. Sec. Admin., Comm'r*, 683 F.3d 443, 447 (2d Cir. 2012) (per curiam) (quoting *Moran v. Astrue*, 569 F.3d 108, 112 (2d Cir. 2009)); *see also* 42 U.S.C. § 405(g). Substantial evidence means "more than a mere scintilla"; it means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (quoting *Consol. Edison Co. of N.Y. v. Nat'l Labor Relations Bd.*, 305 U.S. 197, 229 (1938)). The "substantial evidence" standard is even more deferential than the "clearly erroneous" standard; facts found by the ALJ can be rejected "only if a reasonable factfinder would *have to conclude otherwise*." *Brault*, 683 F.3d at 448 (quoting *Warren v. Shalala*, 29 F.3d 1287, 1290 (8th Cir. 1994)). The court is mindful that the Social Security Act is "a remedial statute to be broadly construed and liberally applied." *Dousewicz v. Harris*, 646 F.2d 771, 773 (2d Cir. 1981).

## Analysis

On appeal, Plaintiff argues that the ALJ erred by (1) improperly evaluating opinions and medical evidence and (2) assessing an RFC that is unsupported by substantial evidence, particularly with respect to limitations for migraine headaches, hearing loss, mental health

6

impairments, and Plaintiff's pain syndrome. (*See* Doc. 14 at 17–20.) The Commissioner maintains that substantial evidence supports the ALJ's decision and that it complies with the applicable legal standards. (Doc. 16 at 1.)

## I.    The Treating Physician Rule

As part of her challenge to the ALJ's evaluation of opinion evidence, Plaintiff claims that the ALJ failed to consider treating physician opinions. The court accordingly begins with the treating physician rule. The treating physician rule "generally requires a measure of deference to the medical opinion of a claimant's treating physician." *Halloran v. Barnhart*, 362 F.3d 28, 31 (2d Cir. 2004) (per curiam); *see also* 20 C.F.R. § 404.1527.[2]

Under the treating physician rule, "the opinion of a claimant's treating physician as to the nature and severity of the impairment is given 'controlling weight' so long as it 'is well-supported by medically-acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record.'" *Burgess v. Astrue*, 537 F.3d 117, 128 (2d Cir. 2008) (alteration in original) (quoting 20 C.F.R. § 404.1527(c)(2)). Even when a treating physician's opinion is not given controlling weight, it is still entitled to some weight because treating physicians are "likely to be the medical professionals most able to provide a detailed, longitudinal picture of [the claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence." 20 C.F.R. § 404.1527(c)(2). If a treating physician's opinion is not given controlling weight, the weight to be given the opinion depends on several factors: (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship; (3) the relevant evidence supporting the

---

[2] The rules in 20 C.F.R. § 404.1520c apply to claims filed on or after March 27, 2017. Because Plaintiff filed her claims before that date, § 404.1527 and the treating physician rule apply in this case.

opinion; (4) the consistency of the opinion with the record as a whole; (5) whether the opinion is

of a specialist; and (6) other factors which tend to support or contradict the opinion. *Id.*

§ 404.1527(c)(2)–(6).

## A. Dr. Welther

### 1. Treatment and Opinions

Dr. Michael J. Welther met Plaintiff as a new primary care patient on February 20,

2015—about two years after the alleged onset date and Plaintiff's 2013 DIB application, and

shortly after Plaintiff concluded treatment with pain management specialist Dr. Brian Erickson

(discussed below). (AR 3073.) Plaintiff's previous primary care physician, Dr. Therese

Dranginis, treated her between February 2013 and January 2015. (*See* AR 416 (visit to establish

care); AR 1365 (last appointment with Dr. Dranginis).) At the initial February 2015

appointment, Dr. Welther noted that Plaintiff had a long and complicated medical history related

to an August 2008 motor vehicle accident. (*Id.*) He briefly recounted that history in pertinent

part as follows:

> [D]irect admission to Alb Med where she had multiple [fractures], ruptured spleen
> eventually removed, large scalp laceration, then post hosp[ital] complications of
> bowel obstruction and re surgery at SVMC [Southern Vermont Medical Center.]
> [S]ince then she has had chronic pain syndrome mostly of R shoulder neck R lower
> back, and has been to multiple providers and on multiple meds including methadone
> percocet etc[.] [M]ost recently been at pain clinic at UVM [University of Vermont]
> and on fentanyl patch and prn oxycodone with fairly reasonable control[.]
> [R]esulting depression, anxiety PTSD have required counseling and doing some
> cognitive relaxation counseling as well . . . .

(*Id.*) Upon physical examination, Dr. Welther noted "R shoulder decreased ROM [range of

motion] winging or R scapula, lower back tenderness not localized." (*Id.*) It is undisputed that

Dr. Welther treated Plaintiff at regular appointments after the February 2015 appointment

through at least January 18, 2018. (AR 3244.)

8

Dr. Welther wrote a letter to "Whom it May Concern" regarding Plaintiff on October 28, 2016. (AR 3650.) The letter appears to be in support of vocational rehabilitation for Plaintiff. (*See* AR 2726.) It states:

> In order for [Plaintiff] to work she would need to be restricted to no more than 4 hours a day. She should not have any prolonged standing or walking. She should have no bending. There should be no strain on her back from any activity. She should be able to sit and use her hands etc. No lifting anything more than 10 pounds. No stooping down kneeling recommended at this time. These restrictions may be modified over time depending on how she is functioning. She is still undergoing some testing and treatment to improve her mechanical back problems and neuropathy.

(*Id.*)

Dr. Welther also supplied a medical opinion on April 4, 2018. (AR 3725–30.) He opined that Plaintiff is unable to work an eight-hour day and that work-related abilities are affected by pain. (AR 3726.) He further opined that Plaintiff's mental health interferes with her physical and cognitive functioning, and that she is unable to handle stressful situations. (*Id.*) He explained that his opinions regarding Plaintiff's limitations are supported by multiple surgeries causing pain and dysfunction; multiple medications impacting functioning; and failed attempts to work. (*Id.*) Dr. Welther stated that he assessed mental health limitations due to "anxiety," "low self esteem," "poor coping ability, [and] poor support system." (AR 3727.)

Dr. Welther also offered opinions on Plaintiff's concentration, persistence, and pace. He opined that she does not have the ability to concentrate and focus on job-related tasks for continuous two-hour periods consistently throughout an eight-hour workday and five-day workweek. (*Id.*) He further opined that Plaintiff's impairments would interfere with her ability to complete job-related tasks in a timely manner or reduce her pace in performing work-related tasks. (*Id.*) In particular, he opined that the effects of Plaintiff's impairments would cause her to be off-task more than 20% of an eight-hour workday. (*Id.*) He stated that Plaintiff would need

9

more than ordinary rest breaks during a workday or shift. (*Id.*) He articulated the following medical reasons for his opinions about concentration, persistence, and pace: "Pain, concentration, poor stamina, positioning difficulty." (*Id.*)

Dr. Welther further opined that Plaintiff's medications—including a fentanyl patch— affect Plaintiff's alertness and concentration. (AR 3729.) He further opined that he expected Plaintiff to be absent from work because of her impairments "several days per month at best." (AR 3729.) In support of his conclusion about work absences, Dr. Welther listed Plaintiff's "previous failed attempts" at work. (*Id.*)

## 2. ALJ's Failure to Explicitly Analyze Dr. Welther's Opinions

ALJ Merrill's June 22, 2018 decision refers to Dr. Welther and some of his treatment notes between 2015 and 2017. (*See* AR 726, 736, 738, 739.) According to the ALJ, Dr. Welther's treatment notes support no more than a "mild" mental health limitation. (AR 726– 28.) As to physical impairments, the ALJ further concluded that Dr. Welther's notes indicate "only mild pain and distress." (AR 736.) The ALJ's decision does not explicitly mention Dr. Welther's October 28, 2016 letter opinion or his opinion dated April 4, 2018. The ALJ did write that "[e]ven though a specific exhibit may not be mentioned, I have reviewed and considered all exhibits: 3,729 pages." (AR 721.) Later is his decision the ALJ stated that he considered "all opinions within the record." (AR 743.) Introducing his analysis of opinion evidence, the ALJ stated that the opinions of Plaintiff's treating physicians "are not entitled to controlling weight." (AR 740.) The ALJ went on to discuss and assign weights to the opinions of several treating physicians and other opinion evidence, but Dr. Welther's opinions do not appear in that discussion.

10

Plaintiff argues that the ALJ's failure to mention Dr. Welther's opinions is "clear reversible error." (Doc. 14 at 28.) Relying on the portions of the ALJ's decision stating that the ALJ considered "all exhibits" and "all opinions," the Commissioner maintains that the ALJ did consider Dr. Welther's opinions. (Doc. 16 at 15.) According to the Commissioner, the ALJ properly afforded those opinions no controlling weight on the grounds that they were not well supported and were inconsistent with other substantial evidence. (*Id.*) Plaintiff replies that the Commissioner cannot supply a post hoc rationalization for agency action and that the ALJ failed to supply adequate specificity for the court to decide whether the determination is supported by substantial evidence. (*See* Doc. 17 at 1–3.)

The regulations require the Social Security Administration to "consider all evidence in [a claimant's] case record when [making] a determination or decision whether [the claimant is] disabled." 20 C.F.R. § 404.1520(a)(3). Here, although the ALJ's decision does not discuss Dr. Welther's opinions, the court can reasonably infer that the ALJ did at least consider those opinions. The ALJ stated that he considered "all exhibits" and "all opinions." The ALJ admitted numerous documents into evidence, the range of which includes Dr. Welther's opinions. (*See* AR 759, 803–04.) The court therefore concludes that the ALJ's statement that he considered all opinions is "sufficient to establish that the ALJ considered [Dr. Welther's opinions], even though [the ALJ] did not address [those specific opinions]." *McKinstry v. Astrue*, No. 5:10-cv-319, 2012 WL 619112, at *5 (D. Vt. Feb. 23, 2012).

Although the court can infer that the ALJ *considered* Dr. Welther's opinions, the court must also analyze whether the ALJ's failure to *discuss* those opinions constitutes reversible error. The regulations dictate that, "[r]egardless of its source, we will evaluate every medical opinion we receive." 20 C.F.R. § 404.1527(c). In addition, the Social Security Administration must

11

"always give good reasons in our notice of determination or decision for the weight we give your treating source's medical opinion." *Id.* § 404.1527(c)(2). In light of those requirements, the court concludes that the ALJ's failure to discuss or otherwise evaluate Dr. Welther's opinions was error. *See Estrella v. Berryhill*, 925 F.3d 90, 95 (2d Cir. 2019) (if the ALJ decides that a treating physician's opinion is not entitled to controlling weight, then the ALJ must "explicitly" apply the relevant factors; failure to do so is "procedural error"); *Bautista v. Berryhill*, No. 3:18CV01247(SALM), 2019 WL 1594359, at *6 (D. Conn. Apr. 15, 2019) (ALJ's failure to "discuss or otherwise evaluate" treating physician's opinion was error).

But "[f]ailure to address evidence is harmless error if consideration of the evidence would not have changed the ALJ's ultimate conclusion." *McKinstry*, 2012 WL 619112, at *5. As the Second Circuit has explained:

> If "the Commissioner has not [otherwise] provided 'good reasons' [for its weight assignment]," we are unable to conclude that the error was harmless and consequently remand for the ALJ to "comprehensively set forth [its] reasons." . . . If, however, "a searching review of the record" assures us "that the substance of the treating physician rule was not traversed," we will affirm.

*Estrella* 925 F.3d at 96 (brackets in original) (quoting *Halloran v. Barnhart*, 362 F.3d 28, 32–33 (2d Cir. 2004) (per curiam)). The court accordingly proceeds to conduct a harmless error analysis.

### 3. Harmless Error Analysis

Regarding specialization, the ALJ noted that Dr. Welther is a primary care provider. (AR 736.) There is no indication that Dr. Welther is a specialist in pain management, mental health treatment, or any other relevant area. Plaintiff does not contend otherwise.

Regarding the frequency, length, nature, and extent of treatment, the ALJ's discussion of Dr. Welther's treatment notes from 2015 through 2017 demonstrate that the ALJ was aware of the multi-year treatment relationship. The Commissioner does not dispute Plaintiff's assertion

that Dr. Welther saw and treated Plaintiff on at least a monthly basis. (*See* AR 818 (testimony that Plaintiff sees Dr. Welther at least once a month).) The ALJ observed that Dr. Welther made notations relevant to Plaintiff's mental and physical health during the course of treatment. (*See* AR 726, 736.) The ALJ also recognized that Dr. Welther prescribed opioid medications to Plaintiff. (AR 734.) At the hearing, the ALJ heard evidence that Dr. Welther administered pressure point injections and cortisone injections in Plaintiff's neck. (AR 808.) The ALJ further recognized that Dr. Welther referred Plaintiff to specialists to address complaints of pain. (*See* AR 736.)

The Commissioner argues that there is no support for Dr. Welther's "overly restrictive" opinions. (*See* Doc. 16 at 16.) The Commissioner points to Dr. Welther's statement in his April 4, 2018 opinion that Plaintiff is unable to work an eight-hour day. (AR 3726.) Somewhat similarly, Dr. Welther stated in his October 28, 2016 letter that Plaintiff was limited to working no more than four hours per day. (AR 3650.) The Commissioner asserts that a medical source's statement that a claimant is unable to work is not a medical opinion and is not entitled to any significant weight. (Doc. 16 at 16.)

The Commissioner is correct that a medical source opinion that a claimant is "unable to work" is not a medical opinion and is not entitled to any special significance. 20 C.F.R. § 404.1527(d); *see also Tanya L. v. Comm'r of Soc. Sec.*, No. 2:17-cv-136, 2018 WL 2684106, at \*6 (D. Vt. June 5, 2018) (treating psychiatrist's opinion that plaintiff was unable to work was not entitled to any significant weight because it was on an issue reserved to the Commissioner); *Savage v. Comm'r of Soc. Sec.*, No. 2:13-cv-85, 2014 WL 690250, at \*5 (D. Vt. Feb. 24, 2014) (doctor's statement that plaintiff could not work "full time" was not a medical opinion). At the same time, the ALJ cannot discount a medical opinion in its entirety solely because the opinion

includes a statement about the plaintiff's ability to work. *Thomas v. Berryhill*, No. 1:17-CV-0042-LJV-RJA, 2019 WL 2264966, at *2 (W.D.N.Y. May 28, 2019). It is necessary to review the support for the other statements in Dr. Welther's opinions.

The Commissioner also seizes on Dr. Welther's statement—written immediately after his statement that Plaintiff is unable to work an eight-hour day—that Plaintiff is "unable to stand walk lift reach." (AR 3726.) If that statement was intended to be unqualified, the court would agree with the Commissioner that it is unsupported. Indeed, Plaintiff herself testified that she can walk (albeit with a limp) for a short distance before getting "really tired" and starting to hurt. (AR 823.) She also stated that she can lift up to five pounds. (*See* AR 806.) And Dr. Welther himself opined that Plaintiff is capable of "short lasting sit reach." (AR 3726.) There is no support for an opinion that Plaintiff categorically cannot stand, walk, lift, or reach.[3]

But Dr. Welther's statement about standing, walking, lifting, and reaching was in response to a compound question that asked about the effects of Plaintiff's impairments on those functions *and* for an opinion regarding "how long during an 8-hour day you would expect that she could perform the function on a regular and continuing basis consistently over 40 hour work weeks." (AR 3726.) Read in that context, Dr. Welther's opinion about standing, walking, lifting, and reaching is less restrictive than the Commissioner suggests. Although Dr. Welther did not supply a quantitative estimate of length of time that Plaintiff could perform those functions, he plainly opined that Plaintiff is unable to perform those functions on a regular and continuing basis consistently over a 40-hour work week.

---

[3] The Commissioner argues that treatment records are inconsistent with an opinion that Plaintiff is "unable" to stand, walk, lift, or reach. (Doc. 16 at 16.) The court agrees that those records are inconsistent with a conclusion that Plaintiff is categorically unable to perform those activities.

14

Finally, the Commissioner argues that Dr. Welther's opinion is inconsistent with other opinion evidence. (Doc. 16 at 16.) The court reviews the other opinion evidence below. For the reasons discussed below, based on its searching review of the record, the court is unpersuaded that the ALJ complied with the substance of the treating-physician rule when considering Dr. Welther's opinion.

**B. Dr. Erickson**

**1. Treatment and November 2014 Opinion**

Dr. Brian Erickson—a pain management specialist with the Tilley Pain Clinic in South Burlington, Vermont—began treating Plaintiff on April 7, 2014. (AR 569.) At the first visit, Dr. Erickson compiled a thorough account of Plaintiff's history of present illness. (*Id.*) He noted, among other things, that Plaintiff had previously been seen in the clinic, initially on September 27, 2013, and that she had been referred from her orthopedic surgeon Dr. Nathan Endres. (*Id.*)

Dr. Erickson's impression was as follows. He noted Plaintiff's injuries from the 2008 accident and that "[s]he continues with significant physical pain despite a variety of anesthetic interventions, medication regimens." (AR 571.) She reported "optimal functioning when she was on low-dose Fentanyl patch and Percocet p.r.n." (*Id.*) Dr. Erickson noted that "[c]omorbid problems may include traumatic brain injury and possible cognitive impairment, as she describes no longer having a photographic memory, having short-term impairment." (*Id.*) He also noted that Plaintiff "may have a comorbid posttraumatic stress disorder history." (*Id.*) He recommended a treatment plan that included "augmenting strategies for the neuropathic pain" with medications, increasing a compound formulation, and screening laboratories for certain conditions. (*Id.*)

15

Dr. Erickson treated Plaintiff at subsequent appointments on June 17, 2014 (AR 1351),

October 29, 2014 (AR 1507), and January 15, 2015 (AR 1330). At the June 17, 2014

appointment, Dr. Erickson began a trial of the Fentanyl patch, noting reports from Plaintiff and

her mother that Plaintiff had better functioning on that medication. (AR 1352.) At the

October 20, 2014 appointment, Plaintiff reported that the Fentanyl patch permitted her to

function "somewhat," and Dr. Erickson recommended continuing with that medication; he also

prescribed oxycodone 5 mg as needed. (AR 1508.) Dr. Erickson left the pain clinic after the

January 15, 2015 appointment, so that was Plaintiff's final visit with him.

Dr. Erickson completed a medical source statement on November 4, 2014. (AR 713.)

He opined that Plaintiff suffers from chronic pain syndrome and that Plaintiff's complaints of

pain were not out of proportion to the severity of any documented precipitant. (*Id.*) On a scale

from no pain to extreme pain, Dr. Erickson described Plaintiff's pain as "Moderate." (*Id.*) He

noted a musculoskeletal diagnosis by Dr. Endres and identified symptoms and signs as including

muscle spasm and impaired sleep. (*Id.*) He marked associated psychological problems as

including personality change, depression, and social withdrawal. (AR 714.) He opined that

Plaintiff is not a malingerer. (*Id.*)

Dr. Erickson did not include assessments about functional limitations in walking, sitting,

and standing; he deferred instead to a physical therapy evaluation. (*Id.*) He did hand-write that

Plaintiff reported being "exhausted" after a four-hour light-duty day. (*Id.*) He opined that

Plaintiff requires a job that permits shifting positions at will from sitting, standing, or walking.

(*Id.*) He also opined that Plaintiff would sometimes need to take unscheduled breaks during a

workday due to pain or numbness. (AR 714–15.) Regarding exertional and manipulative

functioning, Dr. Erickson wrote that he deferred to Dr. Endres and to a physical therapy

16

evaluation. (AR 715.) He opined that Plaintiff is capable of low-stress jobs and that her
impairments are likely to produce "good days" and "bad days." (AR 716.) He estimated that
Plaintiff would likely be absent from work as a result of impairments or treatment more than four
days per month. (*Id.*)

### 2. ALJ's Analysis of Dr. Erickson's Opinion

The ALJ afforded "little weight" to Dr. Erickson's opinion. (AR 741.) He first stated
that the treating-source rule does not apply to Dr. Erickson's opinion, asserting that Dr. Erickson
saw Plaintiff only twice, at appointments in April and October. The ALJ also noted that
Dr. Erickson did not perform physical examinations at those appointments. He stated that
Dr. Erickson deferred on the physical limitation questions and failed to provide a function-by-
function assessment. Regarding the questions to which Dr. Erickson did respond—low-stress
job, absences, personality change, social withdrawal, and "good and bad days"—the ALJ stated
that Dr. Erickson's treatment notes "reflect the subjective reports of the claimant." (*Id.*)

### 3. Dr. Erickson is a Treating Physician

The ALJ correctly noted that the opinion of a physician who only examined a claimant
"once or twice" was "not entitled to the extra weight of that of a 'treating physician.'" *Petrie v.
Astrue*, 412 F. App'x 401, 405 (2d Cir. 2011) (summary order) (quoting *Mongeur v. Heckler*,
722 F.2d 1033, 1039 n.2 (2d Cir. 1983) (per curiam)). But the ALJ's statement that Dr. Erickson
saw Plaintiff only twice is incorrect. The record shows that Dr. Erickson saw Plaintiff at three
appointments (April 15, June 17, and October 29, 2014) prior to providing his November 4, 2014
medical source statement, and also at a final appointment on January 15, 2015.

The court accordingly concludes that the ALJ erred in determining that the treating-
source rule is inapplicable to Dr. Erickson's opinion. Dr. Erickson treated Plaintiff on three

occasions in 2014 before rendering his November 2014 opinion. That is a frequency "consistent with accepted medical practice for the type of treatment and/or evaluation required" for Plaintiff's medical conditions. 20 C.F.R. § 404.1527(a)(2); *see also Meadors v. Colvin*, No. 5:13-CV-0160 (LEK), 2015 WL 224759, at \*9 (N.D.N.Y. Jan. 15, 2015) (pain management specialist who saw patient three times in less than a year was a treating physician). The court evaluates below whether the ALJ's error on this point might be harmless. *See Robert B. v. Comm'r of Soc. Sec.*, No. 6:17-CV-0508 (DJS), 2018 WL 4215016, at \*6 (N.D.N.Y. Sept. 5, 2018) (noting, in connection with argument that ALJ failed to recognize doctor as a treating physician, that "[a]n error in weighing a physician's opinion may be considered harmless where proper consideration of that opinion would not change the outcome of the claim").

### 4. Harmless Error Analysis

Plaintiff argues that the ALJ failed to provide good reasons for assigning "little weight" to Dr. Erickson's opinion. (Doc. 14 at 30.) Initially, the court notes that the ALJ made only a tangential reference to the fact that Dr. Erickson is a pain specialist. (*See* AR 741 (describing Dr. Erickson as a "pain center doctor").) The ALJ also did not write on the topic of the nature and extent of Dr. Erickson's treatment, such as his detailed review of the history of Plaintiff's illness, interactions with Plaintiff's other providers, prescription and adjustment of medications, and screening laboratory studies for other conditions. (*See* AR 571.) The court continues its harmless error analysis by considering the reasons that the ALJ gave for the weight assigned to Dr. Erickson's opinion.

The ALJ stated that Dr. Erickson did not perform physical examinations. It is true that Dr. Erickson's treatment notes do not report detailed physical examination results. However, as Plaintiff points out, Dr. Erickson is a pain management specialist, not an orthopedic specialist.

18

His thorough account of Plaintiff's history of present illness reveals his understanding of her physical condition and many of the findings and interventions by her other providers. His treatment notes and his opinion also indicate that he reviewed and relied on Dr. Endres's findings.

Moreover, Dr. Erickson did record observations on "mental status examination" and also noted that Plaintiff "sits off loading her sacroiliac joint." (AR 571.) At the June 2014 appointment it appears that Dr. Erickson recorded Plaintiff's blood pressure and heart rate. (AR 1352.) He also reviewed laboratory results. (*Id.*) At the October 2014 appointment Dr. Erickson noted that as Plaintiff sits "her left shoulder is clearly higher than the right." (AR 1508.) He again recorded her blood pressure and heart rate. (*Id.*) In his November 2014 opinion, Dr. Erickson specifically noted that Plaintiff's symptoms and signs include muscle spasm and impaired sleep. (AR 713.)

These facts suggest that Dr. Erickson satisfied himself that he had sufficient information to treat Plaintiff and that he did perform examinations "consistent with the conditions for which Plaintiff was treated." *Ives v. Colvin*, No. 3:15-cv-621-J-MCR, 2016 WL 5219778, at *6 (M.D. Fla. Sept. 22, 2016). The court agrees with Plaintiff that the absence of documentation of more extensive physical examinations personally performed by Dr. Erickson is not a good reason for discounting his opinion. Neither the ALJ nor the Commissioner cite any contrary authority.

The ALJ also appears to have discounted Dr. Erickson's opinion because he "deferred on the physical limitation questions" in the medical source statement and because he "failed to provide a function-by-function assessment." (AR 741.) Plaintiff argues that Dr. Erickson's deferral on those questions bolsters his opinion because it shows that he only gave opinions "that

19

were within his knowledge and area of expertise." (Doc. 14 at 31.) She also asserts that failure to provide a function-by-function assessment is not a basis for discounting a medical opinion.

Plaintiff is correct that "a failure to provide a 'function-by-function assessment' is not a basis for discounting a medical opinion." *Doyle v. Berryhill*, No. 5:16-cv-24, 2017 WL 2364312, at \*6 (D. Vt. May 31, 2017). "Whether a medical opinion includes a 'function-by-function' assessment is not a factor" in the analysis under 20 C.F.R. § 404.1527(c). *Id.* The court concludes that the absence of responses to some questions in the medical source statement is not a good reason for discounting Dr. Erickson's opinion.

The ALJ further observed that Dr. Erickson's notes "make no mention of low stress jobs, absences, personality change, social withdrawal, or good and bad days." (AR 741.) Plaintiff argues that Dr. Erickson is qualified to render opinions on those issues even if his treatment notes do not mention them. (Doc. 14 at 31.) The court agrees with Plaintiff on this issue. Dr. Erickson was asked to give his professional opinion on these matters; he is qualified to do so as a treating physician. *See Merkel v. Comm'r of Soc. Sec.*, 350 F. Supp. 3d 241, 249 (W.D.N.Y. 2018) (treating orthopedist was qualified to assess functional limitations, including opinion regarding the plaintiff's need for absences).

Finally, the ALJ stated that Dr. Erickson's notes "reflect the subjective reports of the claimant." (AR 741.) By itself, that is not a good reason for discounting Dr. Erickson's opinion. *See Green-Younger v. Barnhart*, 335 F.3d 99, 107 (2d Cir. 2003) ("The fact that Dr. Helfand [treating rheumatologist] also relied on [the claimant's] subjective complaints hardly undermines his opinion as to her functional limitations, as a patient's report of complaints, or history, is an essential diagnostic tool." (internal quotation marks and brackets omitted)). This is especially so because Dr. Erickson is a pain management specialist. *See Theresa S. v. Berryhill*, No. 2:17-cv-

00122, 2019 WL 1434461, at \*14 (D. Vt. Apr. 1, 2019) ("[A] treating physician may consider a patient's subjective complaints in rendering diagnoses and affirming opinions regarding the patient's functionality especially with regard to complaints of pain and fatigue which may not manifest themselves in objective clinical findings.").

Overall, the court is unpersuaded that any of the reasons that the ALJ gave for the weight assigned to Dr. Erickson's opinion constitute "good reasons." But the ALJ's remark about Plaintiff's subjective reports implicates the issue of subjective symptom evaluation (formerly called a "credibility" analysis).[4] *See Evans v. Colvin*, 649 F. App'x 35, 39 (2d Cir. 2016) (summary order) ("[T]o the extent the ALJ discredited PA Thompson's assessments as merely reflective of Evans's subjective reports of pain, we remand for the reasons discussed in the next section of this order [regarding 'credibility']."). The court accordingly considers the subjective symptom evaluation below.

## C.  Dr. Dranginis

### 1.  Treatment and Opinions

As noted above, Dr. Therese Dranginis was Plaintiff's primary care physician between February 2013 and January 2015, before Plaintiff began treating with Dr. Welther. She completed two RFC questionnaires—one regarding neck and back pain dated December 6, 2013 (AR 494–98) and the second regarding headaches dated August 14, 2014 (AR 611–15).[5]

---

[4] The regulations and sub-regulatory policy no longer use the term "credibility," since "subjective symptom evaluation is not an examination of an individual's character." SSR 16-3p, 2017 WL 5180304, at \*2 (Oct. 25, 2017).

[5] Although the December 2013 questionnaire is titled "Headaches" and includes a checkmark that Plaintiff has headaches, it actually relates to neck and back pain. It appears that Dr. Dranginis crossed out the word "headaches" in most of the relevant individual questions and handwrote "neck and back pain." (*See* AR 494–98.)

Regarding neck and back pain, Dr. Dranginis listed Plaintiff's diagnoses as including radiculopathy and myofascial pain syndrome. (AR 494.) She stated that Plaintiff has chronic back and neck pain secondary to the 2008 motor vehicle accident and that the pain occurs "daily." (AR 494–95.) She listed triggers as including stress, vigorous activities, cold, and prolonged sitting. (AR 495.) She opined that Plaintiff is not a malingerer. (AR 496.) She noted that injections worsened Plaintiff's pain and that physical therapy offered only limited improvement. (*Id.*) She described Plaintiff's prognosis as "poor." (*Id.*)

Dr. Dranginis opined that Plaintiff would need two- to three-hour unscheduled breaks three days a week, during which Plaintiff would need to lie down or sit quietly. (AR 497.) She stated that Plaintiff is capable of "low stress" jobs. (*Id.*) She further stated that Plaintiff's impairments produce "good days" and "bad days." (*Id.*) She estimated that Plaintiff would likely be absent from work as a result of impairments or treatment more than four times a month. (*Id.*) Regarding other limitations, Dr. Dranginis opined that Plaintiff is unable to sit or stand for prolonged periods and that she is unable to lift more than three pounds on a regular basis. (*Id.*)

In the August 2014 questionnaire regarding headaches, Dr. Dranginis listed migraine headaches among Plaintiff's diagnoses. (AR 611.) She stated that Plaintiff's headaches occur on the right side of the head and radiate to behind the eyes, and that the headaches are "usually severe" and occur approximately every other day, lasting one to two hours. (AR 611–12.) She identified associated symptoms as including vertigo, nausea/vomiting, photosensitivity, visual disturbances, mood change, and inability to concentrate. (AR 611.) Dr. Dranginis listed numerous triggers including bright lights, activities, hunger, lack of sleep, menstruation, noise, stress, strong odors, weather changes, and dehydration. (AR 612.) According to Dr. Dranginis, test results and objective signs of the headaches include weight loss and imaging of the head and

brain in 2011–2013. (*Id.*) She identified a history of head injury and migraines as explaining

Plaintiff's headaches. (AR 613.) She opined that Plaintiff is not a malingerer. (*Id.*) Regarding

treatment, Dr. Dranginis noted that Topamax is prescribed to reduce the frequency of headaches

and that another medication works "if started early enough." (*Id.*) She listed Plaintiff's

prognosis as poor to fair. (*Id.*)

Dr. Dranginis opined that, due to her headaches, Plaintiff would need to take unscheduled

breaks three days per month during which she would need to lie down or sit quietly for the rest

of the day. (AR 614.) She opined that Plaintiff can tolerate "moderate" work stress as evidenced

by the fact that she was then working at a stressful job four hours per day, five days a week. (*Id.*)

She estimated that Plaintiff would likely be absent from work as a result of headaches about

three times a month. (*Id.*)

Dr. Dranginis also completed medical source statements dated December 27, 2013

(AR 501–02) and July 4, 2014 (AR 682–87). In the December 2013 statement, Dr. Dranginis

opined, among other things, that Plaintiff was limited to lifting and carrying five pounds,

reaching less than one hour, and sitting, standing, and walking for two hours each. (AR 501.) In

the July 2014 statement, Dr. Dranginis opined, among other things, that Plaintiff was limited to

lifting and carrying up to 10 pounds occasionally (and never any greater amount); that she can sit

for a total of four hours and stand for a total of one hour in an eight-hour workday; and that she

can never reach with her right (dominant) hand and can only occasionally reach with her left

hand. (AR 682–84.) She also wrote that Plaintiff "cannot reach overhead [or] sit for long

periods without interruption" and that she "fatigues easily." (AR 687.)

## 2.   Whether the ALJ Gave Good Reasons as to Dr. Dranginis's Opinions

The ALJ recognized that Dr. Dranginis is a treating physician but afforded "little weight" to all of her opinions. (AR 741.) The ALJ articulated two reasons for assigning that weight. First, the ALJ reasoned that Dr. Dranginis "lacks any particular expertise in the claimant's alleged impairments." (*Id.*) The record does not suggest that Dr. Dranginis is a specialist in neurology, orthopedics, or pain management. On the other hand, "the physician's specialty is but one factor among many which should be considered." *Langlois v. Colvin*, No. 2:13-cv-262-jmc, 2014 WL 7178403, at *8 (D. Vt. Dec. 16, 2014). Although it might be appropriate to give *more* weight to a specialist in a relevant field, the court can discern little basis to give *less* weight than is due to a treating physician just because she is not a specialist. *See id.* (fact that treating physician was not a specialist was not a "good reason" for giving little weight to his opinions).

The ALJ stated that the second and most persuasive reason for assigning little weight to Dr. Dranginis's opinions was that "her profound functional limitations are not supported by her own treatment records, which fail to document significant objective findings consistent with her opinion." (AR 741.) Plaintiff asserts that discounting Dr. Dranginis's opinions on this basis is not proper "[i]n the context of this case." (Doc. 14 at 32.) The Commissioner maintains that the ALJ correctly concluded that Dr. Dranginis's opinions are unsupported by her treatment records. (Doc. 16 at 17.)

The ALJ focused particularly on Dr. Dranginis's treatment notes for a December 27, 2013 appointment—the same date that she completed the first of her two medical source statements. According to the ALJ, Dr. Dranginis's observations on that day did not even remotely match the limitations in the medical source statement. The ALJ remarked that there was no objective examination at all on December 27, 2013 because Plaintiff declined

24

examination. Thus, according to the ALJ, Dr. Dranginis had no way to assess Plaintiff's functional capacities if Plaintiff did not attempt objective maneuvers at the appointment. (AR 741; *see also* AR 742 (reasoning that Dr. Dranginis provided no medical or clinical findings to support her opinions as to limitations in standing, walking, or sitting).)

A critical flaw in that line of analysis is that Dr. Dranginis provided opinions on many more topics than just Plaintiff's ability to perform maneuvers related to exertional and manipulative functions. One such additional topic is headaches. Another is chronic pain. The court considers each of those topics below.

### 3. Headaches

The ALJ found Plaintiff's headaches to be non-severe. (AR 724–25, 741.) Plaintiff does not directly challenge that finding, but she notes that RFC determinations must account for limitations imposed by both severe and non-severe impairments, and she maintains that the ALJ erred by failing to include any limitations for her well-established headaches. (Doc. 14 at 18, 36.) The Commissioner asserts that "throughout the period at issue, [Plaintiff] consistently denied having any headaches." (Doc. 16 at 12.) The Commissioner also reiterates the ALJ's remark (AR 724) that imaging of Plaintiff's brain was normal or unremarkable. (Doc. 16 at 12.)

As to the imaging results, this court has observed that headaches "are often not reflected in laboratory tests or other medical evidence." *Hudson v. Comm'r of Soc. Sec.*, No. 5:10-cv-300, 2011 WL 5983342, at *4 (D. Vt. Nov. 2, 2011), *report and recommendation adopted*, 2011 WL 6002466 (D. Vt. Nov. 30, 2011); *accord, Stacy D. v. Comm'r of Soc. Sec.*, 358 F. Supp. 3d 197, 209 (N.D.N.Y. 2019) ("[M]igraine headaches do not stem from a physical or chemical abnormality which can be detected by imaging techniques or laboratory tests." (quoting *Tanner v. Comm'r of Soc. Sec.*, No. 5:15-CV-577 (TJM/ATB), 2016 WL 3189754, at *7 (N.D.N.Y.

May 11, 2016))). The normal imaging results do not constitute a good reason for rejecting Dr. Dranginis's opinions regarding Plaintiff's headaches.[6]

The ALJ found that Plaintiff's "more recent records reflect that [she] consistently denied having headaches." (AR 725.) The Commissioner agrees, citing approximately two dozen instances in the record where physicians recorded in their treatment notes that Plaintiff denied having a headache or did not complain of a headache. Three of those instances were at 2013 appointments with Dr. Dranginis. (AR 386, 411, 470.) Most of the remaining instances are "review of systems" notations by Dr. Welther in 2016 and 2017 where the doctor wrote "Neuro-no HA [headache] dizziness." (AR 2728, 2735, 2747, 2760, 2784, 2845, 3248, 3318, 3338, 3352, 3382, 3410, 3416, 3461, 3528, 3551, 3565, 3609, 3619.) All of the appointments cited appear to be for issues other than headaches specifically—i.e., for opiate abuse (Dr. Dranginis) or for pain management or other conditions (Dr. Welther).

Plaintiff insists that the Commissioner's characterization of the evidence regarding headaches is "completely inaccurate." (Doc. 17 at 4.) The court agrees that a thorough review of the record is incompatible with a conclusion that Plaintiff consistently denied having headaches during the relevant period. She reported migraine headaches at appointments on March 2 and July 18, 2012—even before the alleged onset date. (AR 1861, 2237.)[7] Dr. Dranginis assessed migraines at a March 8, 2013 appointment (AR 409) and added migraines to

---

[6] Dr. Dranginis noted the normal imaging results in her August 2014 RFC questionnaire. (AR 612.) Even though the imaging was normal, the court considers the fact that multiple imaging studies were ordered to be evidence of concerted medical inquiry regarding the head injury that Plaintiff sustained in the 2008 accident and attempts to determine the medical cause of the headaches. (*See, e.g.*, AR 1390 (treatment note discussion of migraines indicating past evaluation including CT and head MRI).)

[7] The ALJ was therefore incorrect in stating that "[m]edical records from 2012 do not mention headache." (AR 724.)

26

Plaintiff's "active problem" list on March 9, 2013 (AR 386). The record reflects numerous

subsequent complaints and assessments of migraines by Dr. Dranginis and other providers

through 2017, including at least three separate visits to the emergency room in 2017 for

headaches. *(See* AR 527, 561, 569, 628, 638, 645, 650, 667, 1297, 1351, 1381, 2018, 2032,

2139, 2655, 2871, 3004, 3052, 3176, 3265, 3283, 3510, 3569, 3576, 3590.) The fact that

headaches were marked as not present in the treatment notes described above does not support

the Commissioner's position that Plaintiff consistently denied having headaches. *Cf. White v.*

*Comm'r, Soc. Sec. Admin.*, No. 5:15-cv-130, 2016 WL 1203750, at *5 (D. Vt. Mar. 22, 2016)

("[A]lthough there are numerous entries indicating that headaches were 'not present,' it is

unclear whether that means White suffered from no headaches at all since the last report.").

### 4. Chronic Pain

As noted above, complaints of pain and fatigue "may not manifest themselves in

objective clinical findings." *Theresa S.*, 2019 WL 1434461, at *14. Dr. Dranginis's treatment

notes—including her note for the December 27, 2013 appointment—repeatedly refer to

Plaintiff's chronic pain and treatment for that pain. *(See, e.g.*, AR 334, 366, 370, 378, 380, 390,

394, 396, 398, 403, 409, 415, 416, 418, 470, 477, 506, 633, 638, 645, 650, 1368, 1372.)

Also relevant to the issue of chronic pain, Dr. Dranginis's observations at the

December 27, 2013 appointment indicated that Plaintiff appeared "chronically ill and

uncomfortable" and that her skin showed "pallor." (AR 508.) Of particular note, the ALJ's

decision omits the reason that Plaintiff declined a physical examination on that date: "[D]eclined

exam, due to pain." *(Id.)* Physical examinations at other times revealed pain with certain

movements. *(E.g.*, AR 642.)

27

Overall, on the issues of headache and chronic pain, the court concludes that the ALJ's reasons for discounting Dr. Dranginis's opinions do not constitute "good reasons." This conclusion informs the court's review of the opinions of Dr. Welther and Dr. Erickson: the errors identified above appear less likely to be harmless. The court's analysis of other opinions and evidence is in accord. *See infra.* The ALJ's errors with respect to Plaintiff's treating physicians are sufficient to warrant a remand.

## II.    Other Opinion Evidence

As noted above, the Commissioner argues that Dr. Welther's opinion is inconsistent with other opinion evidence. The court reviewed the opinions of treating physicians Dr. Erickson and Dr. Dranginis above. The court proceeds here to evaluate other opinion evidence in the record as part of its plenary review and in a further effort to determine whether the ALJ complied with the substance of the treating-physician rule when considering Dr. Welther's opinion.

### A.    Dr. Endres

Dr. Nathan Endres is an orthopedic surgeon. To address Plaintiff's complaints of chronic right scapular pain that had not responded to nonoperative treatment, Dr. Endres performed a right arthroscopic scapulothoracic bursectomy on May 27, 2010 (after the 2008 motor vehicle accident but before the alleged onset date). (AR 3045–46.) It also appears that Dr. Endres referred Plaintiff for a pain consultation with Dr. Brian Monroe in 2013. (AR 488.)

Plaintiff returned to Dr. Endres complaining of chronic right shoulder pain on September 22, 2014. (AR 667.) Dr. Endres assessed pain that "seems to be very much scapulothoracic in nature." (*Id.*) He wrote that he was "not sure what to make of her neurologic symptoms, which are of fairly recent onset." (*Id.*) He discussed treatment options and Plaintiff

28

elected to try an injection and stated that she would consider a brace and "therapy modalities." (AR 668.) Dr. Endres wrote that he "did not see a role for surgery." (*Id.*)

Dr. Endres drafted a letter "To Whom It May Concern" on October 17, 2014. (AR 679.) The letter stated that Plaintiff has had "chronic right shoulder and right upper extremity problems" since the 2008 motor vehicle accident in which she was ejected from the vehicle and landed on her right shoulder. (*Id.*) Dr. Endres noted that Plaintiff underwent "extensive workup including imaging and electrodiagnostic studies. Nonoperative treatment has consisted of medication, injections and therapy. She has been evaluated and treated by chronic pain specialists. She underwent a scapulothoracic bursectomy 05/27/2010. She has tried bracing." (*Id.*) Dr. Endres opined that Plaintiff "will have ongoing pain and dysfunction in her shoulder and arm indefinitely. Therefore, I think she will have a permanent disability regarding her shoulder." (*Id.*)

Dr. Endres also completed two one-page forms with opinions about Plaintiff's functioning. In a form dated October 27, 2014, he opined that Plaintiff could lift or carry 10 pounds for less than an hour. (AR 707.) He opined that Plaintiff could use her hands for gross motor functions, reach, and grasp for less than one hour. (*Id.*) He opined that Plaintiff would not be able to sustain those activities consistently throughout a work-year. (*Id.*) He further opined that sustained activities could cause Plaintiff to regress physically. (*Id.*)

In a form dated November 3, 2014, Dr. Endres opined that Plaintiff would be considered "disabled" as of September 17, 2008 (the date of the motor vehicle accident). (AR 708.) He did not write any response to a question asking for clinical findings to support his opinions. (*Id.*) But he stated that Plaintiff's symptoms and complaints are reasonable considering her record.

(*Id.*) Responding to a question that asked how Plaintiff's condition limits her ability to do activities, Dr. Endres wrote: "Right upper extremity weakness and shoulder/neck pain." (*Id.*)

The ALJ gave "little weight" to Dr. Endres's opinions. (AR 741.) The ALJ asserted that Dr. Endres saw Plaintiff only once, on September 22, 2014. (*Id.*) That is incorrect; as described above, Dr. Endres performed surgery on Plaintiff in 2010, referred her for a pain consultation in 2013, and treated her at a September 22, 2014 appointment. More generally, the ALJ apparently concluded that Dr. Endres's opinions were inconsistent with his treatment notes from the September 2014 appointment. (*See id.*)

It is true that Dr. Endres noted at the September 2014 appointment that no recent imaging studies were available for review. (AR 667.) He also noted Plaintiff's statement that electrodiagnostic studies performed in Bennington in the spring of 2014 were "unremarkable." (*Id.*) Upon examination Plaintiff was in no acute distress; there was no visible atrophy in her right upper extremity; and manual motor testing in all major muscle groups in the right upper extremity did not detect any gross weakness. (*Id.*) Shoulder shrug strength was "symmetric." (*Id.*)

At the same time, Dr. Endres noted diminished sensation throughout the entire right upper extremity, scapular asymmetry in the resting position (accentuated with a wall pushup), some relief of symptoms with a scapular resistance test, and "palpable scapulothoracic crepitus on examination." (*Id.*) He was also aware of Plaintiff's "well-documented history of chronic right shoulder pain" and prior treatment attempts including medications, facet blocks, acupuncture, and a brace. (*Id.*) In short, the unremarkable portions of Plaintiff's electrodiagnostic studies and her physical examination with Dr. Endres do not constitute substantial evidence of normal right upper extremity functioning or a lack of pain.

Regarding the October 17, 2014 letter, the ALJ noted that the lack of a routing history (*see* AR 679), "indicating that it may never have been sent out." (AR 741.) The ALJ also stated that the October 17, 2014 letter is not signed. (*Id.*) But the record indicates that Dr. Endres dictated the letter on October 17, 2014. (AR 679.) It appears as part of Plaintiff's progress notes with Dr. Endres. The text also concludes by stating: "Sincerely, Nathan Endres MD." (*Id.*) The court therefore concludes that the letter fairly represents Dr. Endres's opinion.

The ALJ listed a variety of factors relative to the October and November 2014 forms that Dr. Endres completed. The ALJ suggested that there is an inconsistency between the finding upon physical examination in September 2014 that there was no gross weakness in any right upper extremity muscle group with Dr. Endres's opinion that Plaintiff has right upper extremity weakness. (AR 742.) Assuming that this is an inconsistency, the court concludes that it is an insufficient reason for the weight assigned.

The ALJ noted that Dr. Endres did not respond to the question about supporting clinical findings. (AR 741–42.) As discussed above, that is not a "good reason," at least with respect to Plaintiff's complaints of pain. The ALJ further stated that Dr. Endres offered an opinion regarding exertional and manipulative abilities even though the record does not indicate that he had any discussion with Plaintiff about those abilities. (AR 742.) The court concludes that Dr. Endres is qualified to render opinions on those issues even if his treatment notes do not specifically refer to discussions about them.

The ALJ also stated Dr. Endres's opinions are not supported by the record or by Plaintiff's level of functioning. (*Id.*) According to the ALJ, "Dr. Endres checks that the claimant would be able to work less than one hour in an eight-hour day, yet [she] was working fifteen hours per week, then twenty hours per week beginning summer 2014." (*Id.*) That is a

31

mischaracterization of Dr. Endres's opinion. He did not opine that Plaintiff can "work" only one hour in an eight-hour day. He offered opinions that Plaintiff can lift or carry 10 pounds for less than one hour, and that she can perform manipulative and reaching activities for less than one hour. (AR 707.)

The ALJ further faulted Dr. Endres for his opinion that Plaintiff was disabled as of September 17, 2008 (more than four years before the alleged onset date). (AR 742.) The ALJ reasoned that Plaintiff was clearly not disabled for the period between 2008 and 2011, since she earned above the substantial gainful activity level during that time. (*Id.*) Plaintiff maintains that she did have disabilities since the September 17, 2008 motor vehicle accident. (Doc. 14 at 29.) Ultimately, Dr. Endres's opinion that Plaintiff was "disabled" for any period of time is not entitled to any special significance. Considering the remainder of Dr. Endres's opinions, the court concludes that the ALJ's analysis of Dr. Endres's opinion is insufficient to alter the conclusion that the treating physician rule was violated in this case.

## B. Ms. Matunas

As alluded to above, Plaintiff engaged in physical therapy (PT) with Battenkill Aquatics and Physical Therapy ("Battenkill") between 2012 and 2016. (*See* AR 1861, 1889–96.) Battenkill sent a letter to the State of Vermont Disability Determination Services dated October 5, 2016. (AR 2660.) The letter includes the opinion of Battenkill's physical therapist Allison Matunas, MSPT. The letter states that Plaintiff is able to do the following:

| | |
|---|---|
| Sitting: | 3 to 4 hours with readjusting. |
| Standing: | 1 to 2 hours, less on hard surfaces such as concrete. |
| Walking: | 10 to 20 minutes, level ground. |
| Lifting: | 5 to 10 #, more with left. |
| Carrying: | 5 to 10 #. |
| Handling objects: | cramping, R > L, 10 mins. |
| Hearing: | left side diminished[.] |
| Speaking: | normal. |

32

| Traveling: | Short distances, needs driver for long distance due to medications and pain. |
| Understanding: | Requires more information. |
| Memory: | STM impaired, uses notebook. |
| Sustained concentration: | Requires writing things to compensate. |
| Persistence: | over does it. |
| Social interaction: | diminished. |
| Adaptation: | Requires rest breaks. |

(AR 2660.) As with the opinion of Dr. Welther, the ALJ did not explicitly discuss Ms. Matunas's opinion. However, as noted above, the ALJ stated that he considered "all exhibits" and "all opinions." (AR 721.)

For sources such as physical therapists, the applicable regulations state that ALJs "generally should explain the weight given" to their opinions "or otherwise ensure that the discussion of the evidence in the determination or decisions allows a claimant or subsequent reviewer to follow the adjudicator's reasoning, when such opinions may have an effect on the outcome of the case." 20 C.F.R. § 404.1527(f)(2). Ms. Matunas's opinion could affect the outcome of Plaintiff's case because it indicates more restrictive functioning—especially as to exertional functions—than the RFC.[8] For the reasons stated elsewhere in this decision, the court cannot discern the ALJ's reasoning for discounting Ms. Matunas's opinion.

## C.    Consultative Examiner Dr. Lyon

Consultative examiner Dr. Edd Lyon examined Plaintiff on October 4, 2016. (AR 2652.) He offered the following diagnosis and prognosis:

1.    PTSD/Depression. This seems as much of a limiting factor in her ability to work as anything else.

_____

[8] On the issue of walking, the ALJ stated that "[t]hroughout the record, the claimant's gait was observed to be normal." (AR 739.) Some record entries so indicate, but multiple entries in the record also describe Plaintiff's gait as slow or antalgic. (AR 424, 573, 1566, 2617, 2655, 2906, 2918, 3594.)

2.      Chronic right shoulder and posterior upper back pain. She clearly has
        limited ability to use her right upper extremity based on my examination.

3.      Probable TBI although there was no documentation in the records I have.
        She states she was knocked unconscious in the motor vehicle accident and
        describes problems with concentration.

(AR 2657.) In his functional assessment, Dr. Lyon opined that Plaintiff has no limitation as to

standing, walking, or sitting. (*Id.*) But he also opined that Plaintiff is "unable to lift anything

over 5 pounds based on her description and likelihood from my examination of her right upper

extremity." (*Id.*) He further opined that "[r]eaching and handling are significantly limited by her

right shoulder and upper back pain." (*Id.*)

        The ALJ mentioned Dr. Lyon's opinion that Plaintiff has no limitation with standing,

walking, or sitting. (AR 742.) The ALJ did not mention or discuss Dr. Lyon's opinions

regarding mental functioning or regarding lifting, reaching, and handling. Although Dr. Lyon's

unrestrictive opinion regarding standing, walking, and sitting is inconsistent with the opinions of

Dr. Welther and Dr. Dranginis, all three doctors assessed significant limitations on lifting that are

inconsistent with the RFC found by the ALJ. Dr. Lyons's assessment of limitations from PTSD

and depression is also consistent with Dr. Welther's opinion regarding mental health limitations.

These considerations lend further support to the court's conclusion that the errors with respect to

the treating physician opinions were not harmless.

## D.      State Agency Physicians: Dr. Abramson, Dr. Cook, and Dr. Runge

        State agency physician Dr. Leslie Abramson opined on September 10, 2013 that Plaintiff

could occasionally lift or carry 20 pounds, frequently lift or carry 10 pounds, and that she could

stand or walk for a total of four hours and sit for six hours. (AR 103.) Dr. Abramson also

assessed limited right overhead reaching due to Plaintiff's shoulder injury. (AR 104.) The ALJ

gave "substantial weight" to all of Dr. Abramson's opinions except for the limitation to standing

34

and walking for four hours per day. (AR 742.) The ALJ used Dr. Abramson's opinion as a basis for his RFC determination. (*Id.*) The ALJ reasoned that Dr. Abramson's opinion (except for the opinion regarding standing and walking) is "consistent with the objective medical record, including diagnostic testing and medical signs." (AR 742.) As to standing and walking, the ALJ referred to Dr. Lyon's opinion that Plaintiff has no limitation with standing, walking, or sitting and the fact that neither Dr. Erickson nor Dr. Endres opined as to limitations in those areas. (*Id.*) The ALJ also stated that there were no medical or clinical findings to support Dr. Dranginis's restrictive opinion as to sitting and standing. (*Id.*)

The regulations do "permit the opinions of nonexamining sources to override treating sources' opinions provided they are supported by evidence in the record." *Diaz v. Shalala*, 59 F.3d 307, 313 n.5 (2d Cir. 1995). As to lifting, Dr. Abramson's opinion is inconsistent with more restrictive opinions as discussed above, including the opinion of examining physician Dr. Lyons and treating physicians Dr. Welther and Dr. Dranginis.[9] Since those opinions are based on limitations from pain, the purported absence of diagnostic testing or other objective medical signs is not a good reason for giving more weight to Dr. Abramson's opinion than to the opinions of examining and treating sources. More generally, the ALJ's reasoning that Dr. Abramson's opinion is consistent with the objective medical record elides impairments that do not manifest themselves in objective clinical findings—such as headaches and chronic pain.

---

[9] State examiners Dr. Carl Runge and Dr. Francis Cook also rendered restrictive opinions on lifting and carrying. (AR 908, 933.) The ALJ assigned "limited weight" to those opinions, reasoning that "[t]he frequent normal physical examination findings, including moving all four extremities, do not support limiting lifting to 10 pounds, nor rarely lifting the right upper extremity." (AR 743.)

35

## III. Subjective Symptom Evaluation

The ALJ recognized the Plaintiff suffers from myofascial pain syndrome and found that that impairment is severe. (AR 723.) The ALJ also found that Plaintiff "does have underlying medically determinable impairments that could reasonably cause some symptomology." (AR 733.) But the ALJ concluded that Plaintiff's "statements about the intensity, persistence, and limiting effects of her symptoms . . . are inconsistent with the record as a whole, including treatment history, objective medical evidence, and clinical findings." (AR 734.)

Plaintiff asserts that the relevant factors support a finding that her pain significantly interferes with her ability to work in a competitive environment and supports the opinions of her treating physicians. (Doc. 14 at 23.) The Commissioner maintains that the ALJ properly based his determination on evidence from treating sources, objective record evidence, Plaintiff's activities of daily living, and her part-time work and daily activities. (Doc. 16 at 20.)

Since there is a medically determinable impairment that could reasonably be expected to produce Plaintiff's symptoms, the ALJ was required to evaluate the intensity and persistence of the symptoms to determine how they limit functioning. 20 C.F.R. § 404.1529(c). Generally, if clinical evidence does not fully support the claimant's testimony concerning the intensity, persistence, or functional limitations of the impairment, then the ALJ must consider additional factors, including: (1) the claimant's daily activities; (2) the location, duration, frequency, and intensity of the claimant's symptoms; (3) precipitating and aggravating factors; (4) the type, dosage, effectiveness, and side effects of any medications taken by the claimant to relieve the symptoms; (5) other treatment received; (6) any other measures taken to relieve the symptoms; and (7) other factors. *Id.* § 404.1529(c)(3)(i)–(vii). The ALJ's subjective symptom evaluation is "entitled to great deference and therefore can be reversed only if . . . 'patently unreasonable.'"

*Pietrunti v. Dir., Office of Workers' Comp. Programs*, 119 F.3d 1035, 1042 (2d Cir. 1997)

(quoting *Lennon v. Waterfront Transp.*, 20 F.3d 658, 661 (5th Cir. 1994)).

## A.    Daily Activities

The ALJ concluded that Plaintiff is able to engage in a "wide range of daily tasks."

(AR 735.) The ALJ referred to Plaintiff's time spent at sobriety meetings, volunteering, and

attending appointments. The ALJ also stated that Plaintiff is able to care for herself, do some

housework, drive short distances, and manage her own funds. The ALJ cited references in the

record to performing "strenuous" activities such as going to the gym, doing yard work, and

running a 5K. The ALJ also noted that Plaintiff reported doing yoga, playing bingo, and visiting

family members. (*Id.*) The ALJ also relied on Plaintiff's internship at a real estate office and

part-time work at Home Depot in 2016, concluding that "[t]his level of activity supports an

ability to sustain work far in excess of that described by the claimant's treating physicians."

(AR 736.) Plaintiff asserts that the ALJ misconstrued and took these activities out of context.

(Doc. 14 at 26.)

The ALJ made particular note of the fact that Plaintiff worked part-time. (*See* AR 736

("[T]he claimant's ability to do such work on even a part-time basis is generally consistent with

the residual functional capacity above."); AR 743 ("The claimant has worked 15 to 20 hours per

week.").) The court accordingly begins with that issue. The court recognizes that evidence of

part-time work can support an ALJ's assessment of symptoms. *See Jacob W. v. Berryhill*,

No. 5:17-cv-150, 2019 WL 430890, at *11 (D. Vt. Feb. 4, 2019) (part-time work, when coupled

with the plaintiff's daily activities and other evidence, supported ALJ's assessment of

symptoms). But "a claimant's limited ability to work after the alleged disability onset date does

not disqualify her from receiving disability benefits; the Second Circuit has held that eligibility

37

for disability benefits is not contingent on a claimant being unable to do any work at all." *Lyons v. Colvin*, No. 2:15-cv-226-jmc, 2016 WL 6304684, \*6 (D. Vt. Oct. 27, 2016) (citing cases).

In this case, the evidence supports Dr. Welther's opinion that Plaintiff's attempts at (part-time) work were failures. (AR 3726.) She worked at Turning Point in 2013 and 2014. Plaintiff stated that she frequently did not work all of the hours for which she was scheduled at Turning Point and that the director allowed her to work a "very flexible" schedule. (AR 283.) Records indicate that Plaintiff frequently called in sick due to pain while working at Turning Point. (AR 524.) In an April 3, 2013 psychological evaluation, Dr. Gregory Korgeski noted that Plaintiff described her part-time work at Turning Point as "exhausting" and that she came home "very tired." (AR 360; *see also* AR 570 ("barely getting through her part-time job"); AR 710 ("[S]he is exhausted afterwards.").) Plaintiff testified that she left the Turning Point job because she could no longer physically do the work. (*See* AR 826–27 (describing ability to do monthly reports on her couch but inability to do physical aspects of the job including cleaning, lifting, and going out in the community); *see also* AR 1304 (left Turning Point because it was "too emotionally and physically challenging"); AR 1330 (work was "overwhelming").)

Plaintiff also spent time at a friend's real estate office in 2013, answering phones and learning data entry "to see what she can tolerate." (AR 1330.) According to Plaintiff's testimony, she did that work because she was "bored" and she was "trying to get out of my house." (AR 824.) She did not continue there for more than one summer. (*Id.*) She testified that the work did not go well because the husband hit on her and because her supervisors would send her "nasty texts" when she did not show up because she was not feeling well. (AR 825.)

Finally, Plaintiff worked part-time at the Home Depot from November 2015 until April 2016. (*See* AR 1097.) It went reasonably well initially. (*See* AR 2810 ("Started working

38

at Home Depot about 4 hours a day and so far is working out well and she likes being with people . . . .").) On January 11, 2016, Dr. Welther completed a "Request for Accommodation" form on the basis of Plaintiff's past traumatic injuries. (AR 1582.) He stated that Plaintiff should work not more than five hours per day and 20 hours per week; that she must use a foam pad if standing in one place; and that she needs to sit frequently. (*Id.*) He further specified that Plaintiff must not walk or stand more than one hour at a time. (*Id.*) Plaintiff testified that after Dr. Welther submitted that form, her hours went down to ten hours per week. (AR 805–06.) She used a stool to sit but was unable to pick it up when she had to move. (AR 806.) She testified that Dr. Welther took her out of work temporarily because she started losing feeling in her leg, and then he took her out permanently in April 2016 after finding nerve damage in her leg. (AR 807; *see also* AR 1991 (Dr. Welther's note that left lower neuropathic symptoms caused her to be disabled from work at Home Depot).)

Apart from Plaintiff's attempts at work, the record also reflects other activities. The ALJ cited the following portion of Dr. Korgeski's report regarding activities of daily living:

> Lives in Bennington with her husband. She said she currently spends a lot of time going to meetings, volunteering, going to physical therapy, meeting with her sponsor, therapy, recovery coach, or doctor appointments. Described this as exhausting, however; comes home very tired.
>
> She gets her showers, hygiene, tries to do some housework. Bakes; husband does most of the cooking. She has low stamina for doing housework, gets tired from her many appointments; needs a lot of naps. Drives by herself, not far. Has physical limitations on her activities. Manages her funds with her husband.

(AR 360.) The ALJ also cited an April 5, 2013 treatment note from Dr. Dranginis in which the doctor noted that Plaintiff was attending two sobriety meetings per day. (AR 394.) The treatment note also indicates that Plaintiff was going to PT twice a week, started doing "chair yoga," and was seeing a pain specialist and a counselor. (*Id.*)

39

Dr. Korgeski's description includes qualifications suggesting that Plaintiff's ability to do many of the listed tasks is limited. Dr. Lyon's description of Plaintiff's activities of daily living is similarly restricted. (*See* AR 2653 (does not get out of bed at all about twice a week; does not cook because she cannot stand at the stove; if she does any chores she is "done" for the next day; does not do any yard work).) Plaintiff's ability to do some light chores, visit family members, and attend medical appointments does not indicate that she can work full time. *Lyons*, 2016 WL 6304684, at \*7 (noting that under *Balsamo v. Chater*, 142 F.3d 75, 81 (2d Cir. 1998), a claimant need not be an invalid to receive disability benefits).

The ALJ's reference to "strenuous" activities is derived from Dr. Erickson's April 7, 2014 treatment note in which he stated that Plaintiff had previously done well using a low-dose fentanyl patch. (AR 569.) At that (unspecified) prior time, she would also take Percocet four or five times a day as needed "if she was doing yard work or going to the gym." (*Id.*) "She described during that time [she] ran a 5K, pushing herself because the doctor told her she could never do that and that annoyed her. She acknowledged she passed out at the end." (*Id.*) No substantial evidence indicates that Plaintiff engaged in any of those more strenuous activities regularly during the relevant time period. The court considers Plaintiff's response to medications below.

## B. Location, Duration, Frequency, and Intensity of Symptoms

The record consistently indicates neck and back pain. Pain specialist Dr. Erickson described the pain as "Moderate." (AR 713.) Plaintiff describes the pain as constant or permanent, with an intensity of seven out of ten. (*See* AR 3659; *see also* AR 488 (rating average pain intensity as nine out of ten); AR 1329 (same).) The record also indicates injury-related

40

"incapacitating" and "debilitating" migraines. (AR 645, 2018, 2655.) Plaintiff also experienced pain in her left lower extremity beginning in 2016.

## C. Precipitating and Aggravating Factors

Regarding the neck and back pain, Plaintiff has stated that "doing [too] much" aggravates her pain. (AR 3659.) At her September 27, 2013 appointment with Dr. Monroe she stated that the pain is aggravated by light touch and by physical activities. (AR 488.) Dr. Dranginis also stated that Plaintiff's neck and back pain is triggered by vigorous activities, stress, cold, and prolonged sitting, and that the pain is made worse by exercise or activities. (AR 495.) Dr. Dranginis stated that Plaintiff's headaches are triggered by bright lights, activities, hunger, lack of sleep, menstruation, noise, stress, strong odors, hot weather, and dehydration. (AR 612.) She stated that bright lights, coughing, exercise, noise, odors, and fumes make the headaches worse. (*Id.*)

## D. Medications

By December 2017, Dr. Welther concluded that Plaintiff's headache medications do work when she is able to get them. (AR 3265.) Still, the record reveals numerous complaints of migraines during the relevant period. For neck and back pain, Plaintiff attempted a variety of pain medications. (*See* AR 1508 (reviewing unsuccessful attempts with Vicodin, morphine, Percocet, tizanidine).) The most successful medicate regime was apparently a low-dose Fentanyl patch plus oxycodone as needed. (*See* AR 1508 (Dr. Erickson note that Fentanyl patch allows her to function "somewhat"); AR 1330 ("doing well" on Fentanyl patch; able to get up and has improved function).)[10]

---

[10] The court notes that although Plaintiff experienced some improvement with her pain medications in early 2015, she was still unable to tolerate the part-time work at Home Depot in 2015–2016.

41

### E.    Other Treatment or Measures

Plaintiff attempted injections for pain. Some injections provided temporary relief. (*E.g.*, AR 3610 ("[G]ood response to initial epidural . . . .").) Other injections caused a "variety of adverse experiences." (AR 1330.) A compounded cream was ineffective. (AR 1508.) A TENS unit was "sometimes helpful." (*Id.*) She participated in physical therapy for years. She attempted a back brace but apparently did not tolerate it well. (AR 667.) According to Dr. Endres, no further surgical options are available for treatment of the pain: "I do not see a role for surgery." (AR 668.)

### F.    Other Factors

Plaintiff asserts that her allegations are supported by her continuing efforts to try to work (discussed above) and by her excellent work history between 1998 and 2014. (Doc. 14 at 26.) A claimant's "prior work record" can inform the subjective symptom evaluation. SSR 16-3p, 2017 WL 5180304, at *6 (Oct. 25, 2017); *see also Guerra v. Colvin*, 618 F. App'x 23, 25 (2d Cir. 2015) (summary order); *Kelley v. Berryhill*, No. 5:16-cv-195, 2017 WL 2735561, at *9 (D. Vt. June 26, 2017) (noting that good work history was relevant to subjective symptom evaluation). Here, Plaintiff's employment earned her four quarters of coverage each year from 1998, when she was 19 years old, through the January 2013 alleged onset date. (AR 1069.) Although not dispositive, those 15 years of work history are relevant to the subjective symptom analysis.

Considering all of the factors above, the court concludes that the ALJ's subjective symptom evaluation lacks adequate support. The ALJ's errors with respect to the multiple treating physician opinions, discussed above, indicate that the ALJ failed to adequately address Plaintiff's complaints of pain. The record reveals a long history of efforts at pain management;

none of Plaintiff's providers suggested that she was exaggerating her pain symptoms. Her daily activities were significantly limited. Her attempts at part-time work—even with substantial accommodations—were unsuccessful.

## IV.    Disposition

For all of the above reasons, the court concludes that the decision of the Commissioner should be reversed and that this case should be remanded. Plaintiff suggests that "[r]emand for calculation of benefits would be appropriate in this case." (Doc. 14 at 37.) Courts have elected to remand for calculation of benefits where there was "no apparent basis to conclude that a more complete record might support the Commissioner's decision." *Butts v. Barnhart*, 388 F.3d 377, 385–86 (2d Cir. 2004) (quoting *Rosa v. Callahan*, 168 F.3d 72, 83 (2d Cir. 1999)). On the other hand, courts frequently remand for further development of the evidence "[w]here there are gaps in the administrative record or the ALJ has applied an improper legal standard." *Rosa*, 168 F.3d at 82–83 (quoting *Pratts v. Chater*, 94 F.3d 34, 39 (2d Cir. 1996)).

The appropriate disposition on remand is a close question in this case. The court's review of the record suggests significantly more substantial pain and other symptoms than are accounted for in the ALJ's RFC. On the other hand, the court is mindful that "[i]t is for the [Social Security Administration], and not this court, to weigh the conflicting evidence in the record." *Schaal v. Apfel*, 134 F.3d 496, 504 (2d Cir. 1998). In this case, the court cannot say with certainty that a correct weighing of the treating physician and other evidence could lead only to the conclusion that Plaintiff is disabled. *See Azeez v. Astrue*, No. 09-CV-3976 (SLT), 2012 WL 959401, at *9 (E.D.N.Y. Mar. 21, 2012) (declining to remand for calculation of benefits because "the ALJ must properly weigh the treating physicians' opinions before a clear conclusion can emerge").

## Conclusion

For the reasons stated above, Plaintiff's Motion for Order Reversing the Decision of the Commissioner (Doc. 14) is GRANTED, and the Commissioner's Motion for Order Affirming the Decision of the Commissioner (Doc. 16) is DENIED. The case is REMANDED for further proceedings and a new decision.

Dated at Rutland, in the District of Vermont, this 16th day of August, 2019.

Geoffrey W. Crawford, Chief Judge
United States District Court